Next case is Mentor Graphics. Versus Eve, Synopsis, 2015, 1470, 1554, and 1556. Mr. Rosencrantz. Good morning, your honors. Thank you. May it please the court, Josh Rosencrantz representing Synopsis. To state the obvious, there are a lot of issues in this appeal. I'd like to focus first on the 376 infringement question. That could resolve four of the issues in this case. Then I'll turn to damages, and if the court permits, I'd like to discuss very briefly one of the issues on the cross appeal, the 828. So on infringement, this court has held three times that if a patent says that a device must identify or indicate something, it must identify or indicate that thing, not some other information that will let you figure out that thing. So applying that principle here, whatever indicate means, what this device does is really far afield from indicating that which must be indicated, which is the execution status of a statement. There is no dispute about what this device does, and I refer the court to page 14 of our brief, where you have a picture of the display of our device. And you see that all it does is to give you signal names, and then it tells you what the signal value is. The only way to figure out which line of code executed from that signal value is to go through an sometimes arduous mental process that is described in Mentor's Brief on page 16 to 18. This is Mentor's Brief in mind-numbing detail. OK, perhaps you're going to tell me my question oversimplifies things, and certainly it's about to. Do you ever go to Baskin Robbins or any other ice cream place? Yes, Your Honor. OK, so you're in Baskin Robbins, and you want chocolate chip ice cream, right? And each of the tubs of ice cream in the bin have a little name plate, chocolate chip, whatever. And each of the tubs are color coded. We don't know why. Maybe it's random. But it turns out that chocolate chip is the only one in the pink tub. And so you say to the clerk, I'll have the ice cream in the pink tub. Have you indicated to him that you're going to have the chocolate chip ice cream? Yes, Your Honor. Because he sees it right there in front of him and knows automatically, without any mental process, which one you're indicating. But what this device does, to take your analogy one step further, is you walk into Baskin Robbins. You say, here's my ice cream preference. I want a chocolate-based ice cream that is named for a moment in the Great Depression. And if you Google that, you will get a bunch of entries. You will definitely find that it's Rocky Road. That's what this invention does. If you look at this signal. Did somebody tell you about my ice cream analogy before you came? Because that's really very swift on your feet. Well, thank you, Your Honor. So what this does is it gives you a signal value. And Mender's own expert acknowledges that this signal value. What do you do with that signal value? Well, this is what the patent itself says is difficult, if not impossible, to do. And it's worth reading from the specification. It's on column two, line seven. What the specification says is, although signals can be analyzed during gate-level simulation, mapping signal values to particular source code lines, that's what we're supposed to do with this, can be difficult, if not impossible. So what does Mender's expert say we're supposed to do? First, you've got the signal value. You have to write down the signal name. Then you have to enter that into a search tool, the text editor. Then you have to find it. Now, it could be in a thousand places. You've gotta go to each of those thousand neighborhoods. And when you find one of those neighborhoods, you first have to check, okay, do I have all of the other signal values I need in order to solve this? Then you have to work through the mental process of figuring out what the answer is. We have an example, the simplest if-then-else statement. I have to tell you, I had trouble plugging in the values with that very simple one. There are lines of code, there are processes that have 15 embedded or nested if-then-else statements. Okay, I think that we understand your argument on this, and 10 minutes, and you've got 27 issues to cover. So why don't you move to damages, because I am very interested in hearing your arguments on damages with regard to 376, if you don't mind. I don't mind at all, no questions. Excellent. So on damages, the district court conceded that it made an error in the jury instructions, and this court has to correct that error. Mentor accused just two features out of thousands in the device. Now, a century and a half of Supreme Court precedent says, in the context of lost profits, that you have to apportion, quote, in every case. At least four times, the Supreme Court has done that in a lost profits case. It did it in Seymour, and I'll quote, the Supreme Court described that case as involving an award, quote, of profits which in the judgment of the law, the patentee would have made, provided the defendants had not infringed with his rights. Garretson does it too. Possibly the best example is Blake, where there is actually a but-for causation that was approved in that case. Now, I understand. Just so I just want to be clear, the four cases that you point to, are each of them patent lost profits cases, or any of them defendant disgorgement cases? So they all involve patent lost profits. Some of them also involved disgorgements. It is simply not true that none of them involved lost profits, and you can see the quotes in our brief. I can give you. Which ones in particular are lost profits as opposed to exclusively disgorgement cases? Which ones of the four? Sorry, I may have been unclear. Every single one of the four involved lost profits. No, no, no. Every single one of the four involved lost profits. Some of them also involved disgorgement. And by the way, this was at a time when lost profits was the leading way to evaluate actual damages. So I'll give you, for example, Blake, and I'll quote here. It was not shown how much of the patentee's profits was due to those other patents, nor how much of it. All of those cases way preempted Panduit, right? These are much older Supreme Court cases. They're still Supreme Court cases. They clearly are the law of the land. But they way preempted Panduit, right? Preceded Panduit. Yeah, preempted before. And so here is my question to you. The district court, I thought, in a very artful way, explained as part of the trial transcript, which I read, in response to whether there is a problem with regard to damages, he explained that he views the Panduit factors as incorporating all of the principles of apportionment that are otherwise necessary. You want me to view Panduit as step one, and some sort of apportionment or entire market value analysis as step two, and require it in every case. What the district court judge said here, quite artfully in the transcript, is wait a minute, doesn't Panduit actually, in order to prove the Panduit factors, haven't you actually proved your entitlement to all of the lost profits on the entire product? Because that's what Panduit requires you to prove. And he concluded that that was the case, and that's why he didn't grant your motion. So why doesn't it, why is it not the case that Panduit already accounts for exactly what you're asking us to add on as another layer of review? Here's why, Your Honor. Panduit, and particularly focused on factor two. So Panduit proves but for causation, right? Panduit proves there are no non-infringing substitutes that this particular customer would have been willing to accept. Yes, no non-infringing, excuse me, no non-infringing substitutes for the feature so that therefore. Oh see, that's what I thought you were gonna say. So I went back and read the jury instruction very carefully. You should pull it out. It's on A-164. The district court didn't say for the feature. He said for the entire emulator. He said an emulator with this feature. Would anyone have thought a different emulator that didn't include this feature? He didn't say feature. Had he focused on feature, that would be a very good response to me. But that's not what you agreed on. This jury instruction was agreed upon within this regard by the parties, and you haven't appealed it apart from or outside of the context of this entire market value rule. Page A-164, and you can see. Sorry, Your Honor, 164C, and where are you reading from? The entire jury instruction is on A-164 and 165, and the entire thing talks about is there a substitute for the emulator? And it goes on, and it actually lists every substitute that was potentially argued by the parties. The cadence emulator system, the FPGA prototype, the software simulator, and then it says, or anything else Synopsys could have made available or developed during the time. So what he is clearly saying, and at the very top even he talks about emulator, is there a substitute? We have an emulator. Now granted, an emulator probably has 100 functions, and only two are patented here, right? But what he charged the jury with is would Intel, because that's where these data really come from, have been willing to buy an emulator without these two features? And the conclusion the jury reached was no. Well, so that is correct. So let me state it in a context that's very familiar to this court. Take that same exact jury instruction. Assume, as is the case here, a two supplier market, at least that's what the jury found, okay? And let's just say it's a laptop with 1,000 features. So what this judge is telling the jury is, if you find that a juror would not have bought a laptop without the keyboard, then Mentor gets all of the lost profits. And it says, in other words, Mentor graphics must show that but for the infringement by Synopsys, there is a reasonable probability that Mentor graphics would have earned higher profits. So if you prove one penny, you get 100%. But- But here's my problem with your logic as you're explaining it now. You have acquiesced in and even encouraged us to adopt the entire market value layer rule as the second layer of analysis for possible apportionment. Correct. The entire market value rule entitles you to all of the profits on something so long as that thing was the basis for the customer wanting it. Yes. So if you're selling a computer that doesn't have a keyboard and I'm selling a computer with a keyboard, and if nobody's willing to buy a computer without a keyboard, it doesn't mean the rest of the stuff you're selling doesn't have value. But the basis for the customer demand for the product is I'm only gonna buy a computer with a keyboard. Your Honor, here's where I- Then hasn't the patentee lost all of the value of the whole thing? So here's where we disagree. I was with you up until the point at which you described what I would call a but-for-cause. A customer will also not buy a laptop without a high-resolution screen or without a long-life battery. But we're trying to figure out what the patentee lost here. Yes. And if the patentee would have made every sale of the whole emulator but for your infringement because they wouldn't have purchased an emulator without these features. These two features drove the demand for the emulator. These two features were a driver of the demand. That same customer also would not have bought the laptop without the other 999 patents that are incorporated into it. Let me give you the perfect example of the mischief that occurs. Mentor accused us of infringing five patents. It sought lost profits, 100% of lost profits as to all five. It was intending to prove but-for-causation as to all five. When the case was down to one, it was still demanding 100% of the lost profits. If I could just, just, if I could. You haven't distinguished for me in a way that I can wrap my head around why Panduit doesn't already account for the entire market value rule, quite frankly. Why these two things are not virtually interchangeable. Because you want me to add a layer of entire market value rule on top of Panduit but the way I read the jury instruction, that's exactly what the jury was charged with doing. No, what the jury was charged with doing was finding that this was a cause, this particular feature which was the only feature that the jury had in front of it. Four other, if those other four patents had been owned by four other patentees, every single one of them would have come in, they would have shown but-for-causation. One is but-for-causation of the battery, the other is but-for-causation of the high-resolution screen. They all would have gotten 100% of our profits. We're now up to 500% and that's before we even accounted for the other 996 patented features in here for which other patentees will demand royalties. So you think entire market value rule means there can only be one basis for the customer demand of a product and that way you can only get sued one time because there's only one thing that's really the basis for the demand? It's not what I think. This court has said the basis for customer demand, the driver of customer demand, not one driver of customer demand. No, that's fine but why isn't this jury instruction meeting that standard? What is wrong with this jury instruction? It expressly says would not have made some or all of the diverted sales but-for infringement and it goes through all of the options which could have been acceptable, available, non-infringing alternatives and it even has a catch-all or anything else synopsis could have come up with. All that is proven is that Intel would not buy a laptop without the keyboard. Intel would also not buy a laptop without the high-resolution screen. So everyone can come in, not everyone. But here's the facts of this case. We have two suppliers and only two suppliers with regard to Intel, Mentor and Synopsys. They're each selling emulators. What this proves is emulator would never have bought the Synopsys emulator without these two functions. That's what this proves. Yes, yes and the testimony in this case and by the way I just- So the basis? A basis. The basis, well no because in this case there's no evidence that Intel would have bought it. That is incorrect, Your Honor. All of the testimony in this case said that the ZEBU feature, excuse me, these two particular probes were nowhere near the top of the list of the most important things. Intel itself said we wouldn't have bought this, we wouldn't have cared that much about these two features. Intel said and by the way Mentor agreed- But that all went to the jury and the jury found otherwise. No, what the jury found was that no one would buy an emulator without the keyboard. That is the amygdala. Actually that's not true because the jury denied them lost profits on the bulk of their sales and gave them only a reasonable amount. Incorrect, incorrect. Yes, and the only sales that they gave lost profits for were the Intel sales but they wanted lost profits for everything. No, Your Honor. And the jury parsed them. That is not correct. The vast majority of the sales here- Okay, the jury parsed them. Maybe I got the vast majority was the wrong word. Maybe I got the quantum wrong. But isn't it true that they asked for lost profits on everything and only got lost profits on a portion of what they asked for? The answer is the jury awarded less than, they sought 47 million. All I know in this black box is that the jury awarded 36 million. They asked for $50,000 in royalties. All I know from this record is that the jury awarded $250,000 in royalties. We have no idea what the jury actually did but all the jury was asked to do was to say not that this was the driver because there were lots of other drivers. The testimony in this record is clear that there were, in Mentor's own witness set, there were 13 features that drove consumer demand. Mr. Rosenkranz, you've consumed your time and run over. We'll give you your four minute rebuttal time back. Thank you, Your Honor. And we'll hear from Mr. Miller. Mr. Miller, I hadn't understood that you were reserving time for a rebuttal on your cross appeal. Yes, Your Honor, we asked to reserve one minute of time on the cross appeal. I see, all right. No doubt you'll want to respond on damages but I want to ask you first about the 526 patent. The district court had found that claim one was not patent eligible because among the stated possibilities for the machine-readable medium was a carrier wave. Now, there's a list of several examples of the medium, a ROM, a RAM, a CD-ROM, a tape, and a carrier wave, which doesn't sound like it's a storage medium. If one has a generic chemical claim encompassing a lot of species and one of them is found not to have the utility of the others, that doesn't normally invalidate the generic claim. Why does the presence of this carrier wave make that claim not patent eligible? In this case, Your Honor, I believe we're distinct from the case of a chemical case, which is an unpredictable art. We are in the area of predictable arts here where the claim in this case covers, as written, something that is non-patentable subject matter, and because it includes non-patentable subject matter, it's invalid. So it would be- It looks like it's an afterthought. The carrier wave is not like a ROM or a RAM or a tape. It's of a different nature. This example of a carrier wave is called out specifically in the NPEP, which describes this scenario identically, where there is a claim that covers both a ROM and a carrier wave, and the guidance from the Patent Office is in that scenario, the claim, because it encompasses non-patentable subject matter, must be rejected as covering too much, including non-patentable subject matter. It would be like a claim that covers the prior art as well as the invention. It's invalid because it covers more than it's entitled to. Here, the claim covers something that's not entitled to be covered. All right, I've preempted your argument and other issues, so why don't you proceed? Thank you, Your Honor. Can I ask you about the lost profits? Just to follow up on, I think, what Mr. Rosenkranz was driving at, just a hypothetical, assume that there's some very complex product that is covered by 1,000 patents, and the manufacturer either owns or is licensed 600 of those patents, but is infringing the other 400, and then gets sued 100 times on 100 patents, and then ultimately is found to infringe, I guess, 50 of them, but 25 of them, of the 50 are competitors seeking lost profits. And then 20 of the 25 successful infringement suits by competitors, they succeed in going through the Panduit factors to establish lost profits. And if there's a million sales, but there's 20 lost profits verdicts on those million sales, now the manufacturer is responsible, essentially, for lost profits on 20 million sales. Is that a logical outcome? Your Honor, I don't believe that that's the correct outcome. I believe that under this court's guidance, when you have multiple parties in the marketplace, the but-for test in Panduit would divide, as this court did in Moreflow, would divide the market up among the parties. In theory, and the way it should apply, is that a defendant who infringes should only pay a lot their lost profits once. So if we have, if I may take a slightly simpler example, let's take a three-party market, and each party has 33%. They've got an equal share of the market. So if party A sues party B for infringement, and party C also sues party B for infringement, and because they're competitors, so that puts us in this lost profits analysis, party A will only get lost profits for their market share, and party C will get lost profits for their market share. So they'll divide the market up, and that would be true for a larger market where you have many competitors. So it's your understanding of Panduit that even if party A and party B are able to prove that for their particular patented component, there's no acceptable non-infringing substitute, the district court still has to continue through the inquiry to figure out whether it's truly a but-for causation. Well, and that happened in this case. The jury instruction required Mentor to demonstrate that it was a two-party market, and the jury found that it was a two-party market, and on that basis awarded lost profits. I wanna address one other point on lost profits. So I guess, are you saying if it's a 25-party market, going back to my hypothetical, then maybe that would be an instance where we have to think of apportionment? I don't think of it as apportionment. I think of it as satisfying the but-for test in a way that addresses the multiple competitor market, and you would have to divide the market up among the competitors. No one, in that circumstance, no one competitor can claim that they would have made all of the sales. They would make their portion of the sales based on their market share, and that is what Moreflow addressed was the market share analysis and whether damages and lost profits should be awarded for the entire market or only for the market share of the patentee, and that's what happened. They got their market share. Now, in this case. So is it, just so I understand, when it comes to damages theory, is it your understanding that when it comes to lost profits for a large machine where there's a lot of little patented components and the patent owner has a patent on one of those components, the way it's going to work out is he's either going to succeed in proving lost profits and therefore will get lost profits on the lost sales of the entire machine, or he's going to be run through a reasonable royalty and just get an apportioned incremental value of the patented component, and so therefore there's no in-between situation where the patent owner in this kind of circumstance would be getting lost profits just for the patented component itself. If the BEV-IV test under Panduit is satisfied, yes, I agree with that. It's either lost profits or it's a reasonable. On the whole machine, or reasonable royalty just on the component. I can't say on the whole machine in every case. It's in the case where you establish under the Panduit factors that the demand is for the whole machine and that there are no reasonable non-infringing substitutes, and in this case, Synopsys was given many opportunities to demonstrate that, and the jury did come back with an award of a reasonable royalty on some of the sales. They did not find that Mentor Graphics would have made all of the sales. There was a division. There were lost profits on some of the sales. There was a reasonable royalty on a portion of the sales. In the Intel market, there was also a jury instruction on the non-Intel market. Now, if I may turn to the infringement question for a moment, I think it's very important to look at the evidence in this case, and there was substantial evidence supporting the jury finding of infringement of claims one, 24, 26, 27, and 28. And what I'd like to focus on with respect to claims one and 28 for the moment is the fact that Synopsys doesn't dispute that the Xebu server and its software create instrumentation signals. That's the reply brief at nine. And in the words of Mentor's expert, Dr. Sarafsadeh, the instrumentation signals precisely indicate which statement in the RTL is active. So Dr. Sarafsadeh used the example of a two-to-one multiplexer. A description of that multiplexer, the two-to-one multiplexer in the associated software, including two statements in the software, appears beginning at 41, 127 in the appendix. Using that diagram as an example, Dr. Sarafsadeh demonstrated that the value of the select line on the multiplexer, that was a signal S, would help you determine precisely which line of code was being executed. In other words, which of the two inputs, the input A or the input B to the multiplexer, would appear at the output C. In Dr. Sarafsadeh's testimony, appearing at appendix 42438, he stated, S will tell you, is it statement one or is it statement two? No mistake about it, it is precise. This testimony established that that indicated the signal, the instrumentation signal, indicated precisely which statement in the source code was being executed. Now this appears in a claim that requires two steps, identifying a statement in the RTL, and synthesizing the source code to create a net list that has that instrumentation signal in it. The example at synopsis use of a picture of the waveform viewer has nothing to do with this claim. Can I get you to turn to your appeal on res judicata, please? Yes. If my colleagues have any more questions for you on infringement, I want to preempt them. If I do, I'll come back. Yes, Your Honor. Would you go ahead and give us your argument on the res judicata? Yes, Your Honor, on res judicata, our position is that the Supreme Court decision in Lawler controls, because the acts of infringement that were at issue did not occur until after the prior judgment in this case. How about just answering what do we do with foster one, foster two, and Nystrom? Or just foster one, foster two first. Well, either foster one and foster two have to be distinguished from Lawler, or we have a problem because we believe that they would be inconsistent with Lawler if applied to our facts. So foster one related to a challenge to validity. And in that case, the argument was that foster raised the same claim of invalidity. The foster two argument was about a breach of a license agreement. And in both cases, the question was whether the issue of validity could be re-litigated. It wasn't a question of whether there was a new claim based on acts of infringement that occurred after a prior judgment. It was those two cases both deal with a situation of an issue of infringement being, excuse me, an issue of invalidity being precluded. So that's how I would distinguish those two cases. So if we come back to Lawler as being the controlling law, this court's decision, subsequent decisions in aspects and brain life, which all state that if the infringing act, that's an act of making, using, or selling, occur after the prior decision, then those acts may be litigated. There's a cause of action. The Kessler Doctrine, we would assert, is inapplicable in this case because it only relates to findings of non-infringement. In this case, there was no finding of non-infringement in the prior litigation. To the contrary, there was a license agreement that was entered into. So you think that the facts of Lawler are very different from the facts of this case, that the facts of this case are kind of on all fours with brain life and aspects. I mean, I'm sorry, when I said Lawler, I meant to say Foster, the two Foster cases. Those, the facts are different, and so you think, to the extent that those Foster cases use language, which might be unfortunate for you, we should not follow them? In this circumstance, that is correct, Your Honor. We don't believe that they should be followed here, and they would be, we are on, consistent with the Lawler facts, with the Brain Life facts, and the Aspects facts, and I think that they have, we have to, in order to make all of the pieces fit, we have to distinguish the two Foster cases based on the fact that they dealt with the issue of invalidity and not with a claim of infringement. Anything further? Not unless the Court has questions, thank you. We can save your remaining rebuttal time for the cross-appeal. Thank you, Your Honor. Mr. Rosenkranz, we'll give you four minutes. Thank you, Your Honor, I actually don't intend to address the cross-appeal in this unless the Court asks questions. Let me just turn to the questions that were asked about damages. I'll start with one overarching point, which is, if Judge Moore's view is described of how but-for causation works, is the law, there should still be a reversal, because we were not allowed to present our evidence that would go to all of the factors. I mean, we called it evidence of apportionment, but it would have gone to all the factors that Judge Moore is suggesting were incorporated in but-for causation, and that is reversible error. But that is not the correct view of the law. One way to know that Panduit but-for cause is not a substitute for apportionment or EMVR is that the evidence on apportionment slash EMVR was so powerful that Mentor disavowed any intention to try to satisfy EMVR. And to Judge Chen's question, I think, Your Honor, you hit the nail on the head. Mr. Miller forgets that there are patentees beyond just competitors. So now that the competitor gets 100% of the profits, there are all these other features for which the maker of a device has to pay royalties, not to mention the features that we developed, and we've lost all of the profits on the sale. No one's gonna sell devices anymore in a world, especially a world where there are just a handful of competitors, if that is the law. And I just want to emphasize, we're not writing on a clean slate here. We have, as Judge Moore recognized, the Supreme Court. Now I recognize that was pre-panduit, but we've got this court citing the Supreme Court cases. It's not like 1946 changed the world. The Supreme Court will view the 284 as a continuation on lost profits, on that body of damages awards, as a continuation of what existed. We've got this court saying in Erickson that damages must be apportioned in every case, including non-royalty cases. Lost profits is the only other option there. I know that this is where all the money is, so I don't blame you for standing up and wanting to talk about it, but I really want to hear your argument on race judicata. Yes, of course, Your Honor. So a few things to say about race judicata. First, the issue presents a direct clash between two completely irreconcilable views of race judicata. There was no way to reconcile brain life with the Foster cases. The Foster cases were not just validity cases. They were also- Is there a way to reconcile Foster with Lawler? Because that seems important. It doesn't cite or discuss Lawler anywhere, and we try to go back in the briefs, we don't see a discussion. Well, Your Honor, I beg to differ. It does cite Lawler. Oh, it does? Yes, yes. Which one, Foster I or II? I think it's Foster I, but we'll verify that. It's definitely one of the Fosters, but it's very easy to distinguish Lawler. So Lawler clearly was the law. It was 1955 or so before the Foster cases. Lawler was a case about, it was an antitrust case, not a patent case. It was a case about a new tort. It was a tort that was similar in nature, but there were new tortfeasors in Lawler, and there are new accusations of tort in Lawler, including tie-ins. In a patent case, it's very different. The patentee is always suing, not just about today's products, but about tomorrow's products as well. And there are all sorts of ways that the patentee can protect himself that are very understandable to this court when they settle, excuse me, when they litigate or when they settle. When they litigate, the patentee addresses the future sales with an injunction, with an ongoing royalty. If they settle, the patentee can always write in the settlement agreement or in the dismissal. And I emphasize that this was a- You said that there's an irreconcilable difference, or that the cases are actually irreconcilable, brain life and aspects on the one hand and the two Foster cases on the other with regard to this claim preclusion issue. Correct. So what do we do? We follow the earlier cases then, since you think that they're irreconcilable. Clearly under, okay look, under Foster, if I read Foster the way you read Foster, you prevail. Under brain life and aspects, were there no Foster, they would clearly prevail. So what do we do? Well, so two things to say about that. First is this court's law is clear that what you do is you recognize that the later panels did not have the authority to override Foster 1 and Foster 2, and you're bound by Foster 1. A very easy way out of this is to recognize that Mentor waived the argument. This was the reason that the district court gave for deciding against Mentor. The reason is Foster 1 prevails. Okay, but let's pretend that I don't want to hear about waiver. Okay, that's the, then- So there's just the earlier case. Well, then I'll turn to the other two judges who may want to hear about waiver. But yes, earlier case wins, or this court can, this panel that is, can refer to an en banc panel. As I understand it, it was synopsis here that filed the DJ action of invalidity and non-infringement, right? Yes, and that was what precipitated- And then Mentor graphics counterclaim for infringement. Correct. So, I mean, maybe there's a way to think about it as if it was your team that opened the door. I mean, why should we bar them from being able to file a counterclaim? I understood, Your Honor. Also an argument that Mentor doesn't make, but I just want to be clear. We were being accused of infringement. Even in a case of race judicata, we are allowed to file a lawsuit to settle rights. I mean, we had just acquired this company to settle rights to demonstrate that race judicata actually precludes them from accusing us of infringement. A huge industry is riding on the answer to the question whether they could accuse us of infringement. Last quick question. Only two of the three patents got barred by race judicata, right? Correct, Your Honor. Why didn't you try to bar the third one? Well, because we got licenses only to the first two. We could have stretched and made a race judicata argument as to the first, as to the 376, but that's the reason. Thank you, Mr. Rosenkranz. Mr. Mello, you can rebut on the one cross-appeal issue that was dealt with by Mr. Rosenkranz. That's race judicata, if you wish. Your Honor, just to judge Moore's question, both foster cases cite a brawler. Your Honor, in the foster one case, the court held that a challenge to validity was not exempt from the normal principles of race judicata. And it talked about litigants being given a second chance to litigate the issue of validity. This is a property dispute. And if you have a dispute about a trespass and somebody's infringement on your property, and in the first case you decide where the property line is, and you come back in the second case, you don't get to re-litigate the question of where the property line is. But it's undisputable that setting foot on the property a second time creates a new cause of action for trespass. Same situation here. New acts of infringement that occurred afterward. And the foster cases, we believe, address the issue, the question of re-litigating the issue of validity. If litigants were given a second chance to litigate the issue of validity, the court stated, alleged infringers might well accept the license under a consent decree and forego an attack on validity until favored by a stronger financial position. So that shows that the foster one decision, that from foster one, that relates to a question of validity, not to the underlying claim of infringement. Synopsis did not move for Reyes-Judicata on the 376 patent. We don't know why, but we do know that the accused in feature for the 376 patent was not inserted into their product until after the first litigation was over. Thank you, Your Honor. Can I correct a misstatement on Judge Chen's last question? Yes. I said that is my own misstatement. So we were licensed to the 376 too. We decided not to press Reyes-Judicata because the product changed. Reyes-Judicata would only apply as to the devices that are essentially the same. So the product changed in a way that triggered the 376, and we decided not to press our lock because Reyes-Judicata is only as to products that are essentially the same. Thank you, Mr. Rosenkranz. We will take the case under advisement. We appreciate the thorough arguments.